**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| ALPINE RESOURCES CORPORATION, d/b/a BLACK MOUNTAIN SKI AREA, )<br><br>*Plaintiff*, )<br><br>vs. )<br><br>TOWN OF JACKSON, )<br><br>*Defendant*. ) | Civil Action No. |

**<u>COMPLAINT – JURY DEMAND – REQUEST FOR INJUNCTIVE RELIEF</u>**

Plaintiff ALPINE RESOURCES CORPORATION d/b/a "Black Mountain Ski Area" ("**Plaintiff**" or "**ARC**") brings this civil rights lawsuit against Defendant Town of Jackson ("**Town**"). Plaintiff demands a trial by jury on all counts so triable.

**INTRODUCTION**

1. This matter arises from the Town's calculated, unlawful, and *ultra vires* campaign to obstruct Plaintiff's legally protected right to sell alcoholic beverages under a valid license issued by the New Hampshire Liquor Commission ("**NHLC**"), in blatant disregard of state law and constitutional protections. Despite being specifically informed of the due process required to limit Plaintiff's sale of alcoholic beverages, the Town intentionally elected to ignore Plaintiff's Constitutional rights by imposing a blanket mandate restricting its ability to sell alcoholic beverages. These actions were unlawful, *ultra vires*, malicious, and unconstitutional.

2. The Black Mountain Ski Area ("**Black Mountain**") is New Hampshire's oldest ski area, having operated in the Town of Jackson, New Hampshire since 1935, providing downhill ski and resort facilities to guests, including without limitation the service of food and

1

alcoholic beverages.

3.  In 2024, Plaintiff's parent company, the Black Mountain Community Corporation, purchased one-hundred percent (100%) of the shares of Plaintiff, and took over operation of Black Mountain through Plaintiff.

4.  Plaintiff holds a valid liquor license from the NHLC to serve alcoholic beverages to on-premises guests, which it obtained in 2024 and has since renewed through March of 2026. As part of the liquor license initial application, Plaintiff was required to, and did, obtain approval from the Town of Jackson. **Exhibit 1 – Town Approval**.

5.  The Plaintiff's liquor license permits Plaintiff to serve alcohol at two locations – the base lodge and at a mid-mountain structure named the "**Alpine Cabin**," including its deck.

6.  On September 22, 2025, the Town of Jackson Select Board announced at its regular meeting that it had decided to revoke its "permission" for the liquor license at the Alpine Cabin (the "**Revocation**"), and then voted in public session to sign a letter to such effect. **Exhibit 2 – Revocation Letter**.

7.  The Revocation and signing of the Revocation Letter were taken without prior notice or warning, without hearing or any due process provided to the Plaintiff, without any findings of fact, and without even being on the Select Board agenda prior to the meeting. Upon information and belief, the Revocation was entirely deliberated and decided in a non-public session.

8.  Moreover, the Select Board Chair asserted at the September 22 meeting that the Revocation immediately prohibited Plaintiff from serving alcohol at the Alpine Cabin.

9.  The Revocation, the signing of the Revocation Letter, and the directive not to serve alcohol at the Alpine Cabin, were (and each of them was) beyond the scope of the Select

Board's authority, illegal, a violation of Plaintiff's Constitutional rights under color of state law, and a violation of N.H. RSA 91-A (the "**Unlawful Actions**" or "**Unlawful Acts**").

10. Moreover, as outlined below, this action was part of a larger pattern of action by which the Town has consistently interfered with the rights and business of Plaintiff and its operation of Black Mountain Ski Area.

## THE PARTIES

11. Plaintiff, Alpine Resources Corporation, is a New Hampshire corporation with a principal place of business at 373 Black Mountain Road, Jackson, New Hampshire, and a mailing address of PO Box 822, Jackson, NH 03846.

12. Defendant Town of Jackson is a municipal corporation with a principal place of business at 54 Main Street, Jackson, New Hampshire, and a mailing address of PO Box 268, Jackson, NH 03846.

13. The governing body of the Town is a Select Board with three (3) members, including Barbara Campbell, Frank DiFruscio, and Bob Thompson.

14. The Town maintains its own police force, the Jackson Police Department, which is a department of the Town, and headed by Chief of Police Christopher Perley.

## JURISDICTION AND VENUE

15. Plaintiff bring this lawsuit pursuant to the Fifth and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; 42 U.S.C. § 1988; and the Declaratory Judgment Act, 28 U.S.C. § 2201, among other Federal and state laws. Generally, and as more fully outlined herein, Plaintiff seeks a declaration that the Town's actions to interfere with Plaintiff's business and liquor license violate the Procedural Due Process Clause of the Fourteenth Amendment, the Substantive Due

Process Clause of the Fourteenth Amendment, and the Takings Clause of the Fifth

Amendment; damages pursuant to 28 U.S.C. § 1983; injunctive relief to enjoin the Town

of Jackson's unlawful and unconstitutional actions; and attorneys' fees and costs pursuant

to 42 U.S.C. § 1988. Plaintiff also seeks relief on the same set of facts and circumstances

under state law, including a writ of mandamus, and damages, injunctive relief, and

attorney's fees pursuant to RSA 91-A.

16. This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

(federal question jurisdiction), 1343(a)(3) (civil rights jurisdiction), and 1367(a)

(supplemental jurisdiction).

17. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2). The Plaintiff and Defendant

each have their principal place of business in this district, and the events giving rise to

Plaintiff's claim occurred in this district.

## STATEMENT OF FACTS

### A.  *History of Black Mountain Ski Area*

18. As noted, Black Mountain is New Hampshire's oldest ski area, having operated since

1935, providing downhill ski and resort facilities to guests, including without limitation

the service of food and alcoholic beverages.

19. Upon information and belief, Black Mountain has maintained a liquor license throughout

its operation during all periods when such licensure was legally required.

20. By 2023, Black Mountain was failing, and the prior owners/operators of ARC announced

that Black Mountain was closing for the 2023-2024 season.

21. Prior to the start of the 2023-2024 season, however, Indy Ski Pass, LLC, via its Director

Erik Mogensen, stepped in to save Black Mountain from closure through provision of

financial assistance while the then-owner sought a buyer. **<u>Exhibit 3</u>** - Nate Weitzer, *Black*

*Mountain ski area to remain open for 2023-2024 season, Tenney Mountain to reopen as well*, BOSTON GLOBE (Oct. 17, 2023).

22.  Unfortunately, the then-owner of ARC and Black Mountain were unable to locate a buyer during the 2023-2024 season. Mr. Mogensen and Indy Ski Pass once again stepped in to save the beloved resort, this time by buying ARC with the intent to convert it to a community owned mountain. **Exhibit 4** - Nate Weitzer, *Entabeni Systems to buy Black Mountain Ski Area, transition to community-based ownership model*, BOSTON GLOBE (Oct. 5, 2024).

23. In or around September of 2024, Plaintiff's parent company, the Black Mountain Community Corporation, took over ARC and the Ski Area, continuing the process to make good on its promise to return ownership of the resort to the community it serves.

*B. History of the License*

24. On or about December 1, 2024, Plaintiff, under Black Mountain Community Corporation ownership, applied for a liquor license, which covered the areas of the base lodge and the Alpine Cabin, specifically including the Alpine Cabin deck. **Exhibit 5** – Application.

25. As part of this application, the Plaintiff sought and received Town Approval, in which the Town noted: "The Town has no issue with Black Mountain Ski Area, and wish to give permission for their business to serve liquor, wine and beer at the base lodge, the back deck, as well as the alpine cabin at the mid-point of the mountain and the deck of the alpine cabin." See **Exhibit 1** - Town Approval.[1]

26. On December 11, 2024, this Application was allowed, and the NHLC issued a temporary

---

[1] The state statute providing for state licensure over liquor sales does not require Town Approval. *See generally* RSA 178:1 et seq. and RSA 663:5 *et seq*. This is only found in Rules promulgated by the NHLC. *See* N.H. Admin R. Liq. § 702.04(a)(12) and 702.05.

liquor license to Plaintiff. **Exhibit 6** – Temporary License.

27. Thereafter, NHLC issued a regular license to Plaintiff. **Exhibit 7** – 2024 License.

28. Generally, liquor licenses in New Hampshire must be renewed yearly.

29. Accordingly, in or around March of 2025, Plaintiff applied to renew its license, and

    NHLC granted such application and renewed Plaintiff's liquor license through March 31,

    2026. **Exhibit 8** – 2025 License.

30. The NHLC has not suspended or revoked Plaintiff's liquor license, which is valid through

    March 31, 2026.

**C.    *January 10-12, 2025 Martin Luther King, Jr. Day Weekend***

31. The Martin Luther King, Jr. Day weekend (the "**MLK Weekend**") is generally a busy

    day for ski areas, is generally a busy day for Black Mountain, and was a busy day for

    Black Mountain in 2025.

32. During the MLK weekend, a number of third-parties parked on the side of Black

    Mountain Road off Black Mountain's property.

33. Despite the absence of "No Parking" signs, the Jackson Police Department ticketed

    numerous vehicles, causing, among other things, confusion and upset.[2]

34. In response, Black Mountain's GM, Erik Mogensen, (the "GM") publicly announced that:

    "If you received one [parking ticket], please send me a photo of it, and I will personally
    reimburse you—no one should be penalized for skiing or riding at Black Mountain, but
    please follow directions from our parking staff. We are meeting with the town next
    week to discuss how we can continue to work together on parking and manage the
    success of Black Mountain."

    **Exhibit 9** – Public Statement.

---

[2] Black Mountain Road is a state-owned road, where, upon information and belief, parking is
allowed within the right of way if not posted.

35. The Jackson Police Chief, Christopher Perley ("**Chief Perley**", or the "**Chief**"), appeared to take personal offense to the GM's lawful offer and, in response, he: a) refused to give the names of parking ticket recipients to facilitate payment; and b) accused the GM of undermining the Chief's authority and promoting lawbreaking.

36. The GM's offer to reimburse parking tickets received national media attention, which unfortunately included unfavorable coverage of the Jackson Police Department.. **Exhibit 10** – Ski Magazine Article; also see **Exhibit 9**, at 2. Black Mountain and Mr. Mogensen, however, continued to receive wide accolades for the turnaround and the increased skier visits that would give Black Mountain a chance at continued operations while also attempting to work with the Chief on parking solutions. *See, e.g*, **Id**.; **Exhibit 11** – Tom Eastman, "*Ayotte gets tour of Black Mountain from New Owner",* CONWAY DAILY SUN (Mar. 26, 2025); **Exhibit 12** – Tom Eastman, "*Welcome to "Jaspen": Black Mountain turns 90 with new attitude",* CONWAY DAILY SUN (April 4, 2025); **Exhibit 13** – Quddus Snyder, "*Cinderella Black",* CONWAY DAILY SUN (April 9, 2025) ("Mogensen is a true breath of fresh air in an anal-retentive and stale white bread corner of the valley.").

D. *May 3, 2025 Black Mountain 90th Birthday Celebration*

37.  On May 3, 2025, Black Mountain held a 90th Year Birthday Celebration, celebrating its 90-year history in the Town of Jackson.

38. The celebration was pre-planned, including obtaining a fireworks permit from the Town and a meeting between Mr. Mogensen and Chief Perley to discuss the event and police requirements, including a request for civil standby. **Exhibit 14** – Tom Eastman, "*Board grants May fireworks permit to Black for 90th",* CONWAY DAILY SUN (April 4, 2025).

39. An announcement in the local paper, the Conway Daily Sun, quoted Mr. Mogensen as

saying: "We're going to celebrate our 90th birthday and the last day of the ski season with $9 lift tickets for all ages and throw the biggest party this place has ever seen." **Exhibit 15** - Tom Eastman, "*Valley Voice, A Very Happy 90th birthday to Black Mountain",* CONWAY DAILY SUN (May 2, 2025).

40. The event was well-attended and well-received – except by the Jackson Police Department, who remained unprepared for the noticed event, despite prior conversations and substantial press coverage in advance of the event. **Exhibit 16** - Tom Eastman, "*Black's 90th celebrated by everyone but police",* CONWAY DAILY SUN (May 7, 2025).

41. At the event, the Jackson Police Department summoned Mr. Mogensen to speak about cars that were parked (allegedly illegally) along Black Mountain Road. Because Chief Perley was parked across the road from Black Mountain, Mr. Mogensen crossed the road in an official Black Mountain OHRV to help to Chief Perley resolve the parking situation. Rather than seek to resolve parking, Chief Perley devoted nearly twenty minutes to giving Mr. Mogensen a ticket for illegal operation of an OHRV, leaving the parking issue unresolved and diverting resources. **Id** (asserting that alleged drunk drivers were released for lack of police resources).

## E.    The RSA 91-A Request and Complaint

42. Despite the prior meeting with Black Mountain, Black Mountain's public announcement, and the Conway Daily Sun's forewarning that it would be the "biggest party this place has ever seen," Chief Perley is quoted in the May 7 article as stating: "There was no forewarning of the size of the event by the management of Black Mountain. There was no scheduled detail or coverage." **Exhibit 16**.

43. Moreover, Chief Perley is quoted as stating:

> "We did have a host of calls for service that we had to respond to, that included drunken patrons that were causing trouble inside the lodge, drunken drivers that were getting intoxicated in the parking lot, as well as driving away drunk… We did have a report of shots fired in and around the area of Black Mountain that was investigated with inconclusive findings. There were no injuries associated with it, and we had a couple of OHRV violations associated with people driving four wheelers on Black Mountain Road."

> "[O]fficers responded to "multiple" reports of intoxicated guests, some of which came from Black Mountain staff as a bartender said she called police after a rude allegedly intoxicated patron had made obnoxious comments to her."

**Id**. Chief Perley also asserted that there were "multiple" parking complaints.

44. Accordingly, in an effort to address any legitimate concerns and complaints, and in the face of the Town and Police Department's refusal to share particularized information, Plaintiff submitted a request pursuant to RSA 91-A seeking all documents and call logs related to complaints regarding the Ski Area. **Exhibit 17** – NH RSA 91-A Request.

45. In response, the Police Department refused to provide the sought-after information, asserting the alleging for each that disclosure would "allow, or create a circumstance to allow, a person to circumvent the law or adversely effect [sic] an on-going criminal investigation(s)." **Exhibit 18** – NH RSA 91-A Response.

46. However, when the Plaintiff was able to obtain these documents almost four (4) months later, the service logs for that day reveal that:

   a. Only one (1) parking complaint had been made, not multiple;

   b. Only one (1) complaint (not multiple) was made by a member of the public about an alleged intoxicated person, who was said to have been drinking on his own in the parking lot, not in the Black Mountain establishment;

   c. One (1) complaint was made by the Black Mountain itself regarding a neighboring property owner discharging a firearm;

    d.  One (1) complaint was Chief's Perley's citation of Mr. Mogensen for allegedly operating an OHV on a state roadway (as he responded to the Chief's request to appear and assist with parking issues);

    e.  The other contact was onsite from Black Mountain itself, seeking removal of a patron who refused to leave (out of hundreds in attendance).

**Exhibit 19** – Service Activity Logs.

47. Further, Plaintiff learned that the investigation cited as a reason to delay production was a New Hampshire Liquor Commission investigation occasioned by a complaint made by Chief Perley himself.[3]

48. A review of the complaints made by Chief Perley reveal not a factual report, but exaggerated and impassioned advocacy against the Plaintiff and Black Mountain's business, calling it: "complete chaos", "lawless", "consum[ing] nearly all of Jackson PD's resources for the bulk of the day," and seeking "a 'Whole of Government' response; police, fire, zoning, and liquor enforcement regulations, moving forward to reel in behavior before there are even more serious consequences." **Exhibit 20** – Perley Email Attaching "After Action Report".

49. Chief Perley also added observations from Kevin Bennett, the Jackson Health Inspector. When asked how these observations were transmitted, Mr. Bennett indicated that he text messaged them to Chief Perley a few days after the event but that the message was deleted from his phone. **Exhibit 21** – Bennett Email. Moreover, despite being responsive

---

[3] Upon information and belief, Chief Perley also made complaints about Black Mountain to: a) the Passenger Tramway Safety Board, with which Black Mountain has held licenses to run its chairlifts throughout its existence; b) the New Hampshire Department of Transportation; c) the New Hampshire Department of Health and Human Services; and d) the Town Select Board.

to the Plaintiff's 91-A request, Chief Perley has not produced this original text message from Mr. Bennett.

50. When the Liquor Commission told Chief Perley that NHLC works with a progressive discipline policy by law, and would need actual evidence (Body Cam footage and/or police reports, receipts, surveillance footage, interviews, etc.), Chief Perley responded: "I hope this statement gets the immediate attention of key members down at Liquor Enforcement. This is outrageous behavior!" and "I would like to know what, if any, immediate steps Liquor enforcement are going to undertake while this matter gets investigated." "I know that the Select board has the right to petition for revocation but that sounds like a slow process." **Exhibit 22** – May 12, 2025 Email Chain, at Bates 287-289.

51. When again told by NHLC that "progressive discipline is **law**, not our policy", that it would require a "full investigation and due process for the licensee", and that NHLC is "unable to bypass those processes over shock/outrage", Chief Perley responded that "I have nearly all the reports compiled and will send them along this week." **Id**, at Bates 284-286.

52. Rather than "compile" the reports, Chief Perley then **created** on May 11, 2025 (a week after the event) a Police Report with Mr. Mogensen as suspected of disorderly conduct, **Exhibit 23** – May 11, 2025 Incident Report; and created on the same day (May 11) his own attached Narrative Report in alleged support. **Exhibit 24** – May 11, 2025 Narrative Report.

53. Chief Perley forwarded this new Report, and other documents, to NHLC on May 15, 2025. **Exhibit 25** – May 15, 2025 E-Mail.

54. A side-by-side comparison of the original Activity Logs, **Exhibit 19**, with Chief Perley's later created "After Action Report", **Exhibit 20**, and Chief Perley's May 11 Police Report and Narrative Report, **Exhibits 23 and 24**, reveals the significantly editorial nature of Chief Perley's later-created documents. Notably, Chief Perley's only personal interaction with Black Mountain on May 3 was the early afternoon parking complaint (not any liquor issues), in which, despite an alleged lack of resources, he devoted twenty minutes to issuing a citation to Mr. Mogensen.

F.      ***NHLC's Investigation and Its Closure***

55. NHLC interviewed Chief Perley on July 6, 2025.

56. On July 8, 2025, NHLC sent Plaintiff's counsel an e-mail discussing a meeting with Plaintiff's owner and manager, indicating: "Like I explained on the phone, this is simply a conversation with the owner, manager, and yourself regarding minor violations and how we can work together to correct them moving forward. The violations we will be discussing simply are "Verbal Counsel's" meaning no fines, license suspensions, or penalties as long as the licensee doesn't repeat the same violation." **Exhibit 26** – July 8, 2025 NHLC E-Mail.

57. This meeting occurred on July 15, and the NHLC closed its investigation on July 23, 2025.

58. NHLC released its Investigative Report regarding Chief Perley's complaint on or about September 17, 2025. **Exhibit 27** – Investigative Report.

59. As explained in the report, and previously in oral communication, the only action taken by NHLC was a Verbal Counselling relating to minor violations relating to restrictions on where in the establishment patrons may be serviced and congregate. See RSA 179:47.

60. Also as noted in the report: "Sgt. Cutting explained that requesting Police assistance during a situation like [reported by Chief Perley] could be viewed as a mitigating factor." **Id**.

61. Finally, as reported: "They were all very open to getting on the same page and working together to get into compliance for the upcoming season." **Id**.

G. *September 22, 2025 Board of Selectmen Meeting*

62. Within five (5) days of the release of the NHLC Investigation report, concluding with a verbal counsel for a minor violation, the Town of Jackson Select Board announced at its regular meeting on September 22, 2025 that they had conducted a prior meeting in a non-public session where they reviewed some documentation, and decided to revoke the Select Board's "permission" for Plaintiff's liquor license for the Alpine Cabin (the "Revocation"), and then voted in public session to sign a letter to such effect. **Exhibit 2 – Revocation Letter**.

63. The Revocation and signing of the Revocation Letter were taken without prior notice or warning, without hearing or any due process provided to the Plaintiff, without any findings of fact, and without even being on the Select Board agenda prior to the meeting. Upon information and belief, the Revocation was entirely deliberated and decided in a non-public session; and the Select Board chair added it as an agenda item at some point during this non-public session.

64. Moreover, the Select Board Chair confirmed at the September 22, 2025 meeting that the position of the Town was that Plaintiff could not serve alcohol at the Alpine Cabin as of the Revocation.

65. While the Select Board offered no reasons for the Revocation before issuing the Letter,

upon information and belief the Revocation was based entirely upon the same information, arguments, and documentation provided to the NHLC, which the NHLC determined only merited a verbal counsel for a "minor violation".

66. Upon information and belief, when Chief Perley did not achieve his preferred immediate result from the NHLC (see **Exhibit 22**, at 287), he turned to the Select Board, which quickly obliged the Chief's demand in a secret session without the due process NHLC stated was required by the law.

67. Moreover, both the Police Chief and the Select Board each actually knew that the Plaintiff was entitled to due process before the Unlawful Actions were taken, and knew that they had no authority to actually direct Plaintiff not to serve alcohol at the time they did so.

68. In fact, the Chief admitted his knowledge in his May 11 email to NHLC by referencing the statutory procedure for a Selectman's Petition for Revocation, complaining that "that sounds like a slow process." **Exhibit 22**, at 287. The Chief was repeatedly and specifically informed that revocation of Plaintiff's license "will require a full investigation and due process for [the Plaintiff]. We are unable to bypass those procedures over shock/outrage." *Id*. Frustrated by the "slow process" involved in following the law, and undeterred by the protections of the United States Constitution and New Hampshire law, the Chief approached the Select Board.

69. In turn, the Town, when approached by the Chief, was already aware of the Plaintiff's clearly established rights. In the Plaintiff's 91-A action, the Town utilized the possibility that the Select Board might commence a Selectman's Petition as a specific defense to its refusal to comply with RFA 91-A. Thus, the Town knew that Plaintiff was entitled to due

14

process; the Town knew how to initiate that process (i.e. a Selectman's Revocation Petition to NHLC); but the Town instead, through the malicious actions of its Select Board members, simply and intentionally chose to violate the Plaintiff's due process rights, and direct the Plaintiff not to serve alcohol at the Alpine Cabin without so much as notice or a hearing, purporting to act under its authority and color of law.

70. This action, taken in concert between the Chief and the Select Board, was knowingly unlawful, illegal, *ultra vires* and beyond the authority of the Chief or the Select Board, and was taken with malicious intent.

71. Finally, while no rationale was offered prior to the Revocation, <u>after</u> the Revocation and the signing of the Revocation Letter:

    a. The Select Board Chair indicated again "multiple complaints over service at the midpoint cabin" without providing "multiple complaints" (nor were there "multiple complaints about service at the Alpine Cabin" in the NHLC report);

    b. The Select Board Chair offered the lack of facilities at the mid-point cabin as a basis for Revocation, where this has been the case since 1938;

    c. Chief Perley asserted that the Plaintiff served alcohol at the Alpine Cabin without a license, which was a knowingly false statement at the time – The NHLC had previously informed Chief Perley that the Alpine Cabin was licensed. See **Exhibit 22**, at 1 (May 12, 2025 email from NHLC stating, "Chief, The Mid Station Pub is the same license as the base lodge."); **Exhibit 5** – Application (specifically showing Alpine Cabin and deck).

    d. The Select Board Chair brought up a skier death wholly unrelated to the May 3 event, or the Plaintiff's service of alcohol.

72. The Revocation, the signing of the Revocation Letter, and the directive not to serve alcohol, were (and each of them was) beyond the scope of the Select Board's authority, illegal, a violation of Plaintiff's Constitutional rights under color of state law, and a violation of N.H. RSA 91-A.

## CAUSES OF ACTION

## Count I: 42 U.S.C. § 1983: the Town's Violation of the Fourteenth and Fifth Amendments to United States Constitution (Procedural Due Process Rights)

73. Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

74. As described herein, the Town took the Unlawful Actions without prior notice or warning to the Plaintiff, without the subject even being on the agenda before the Select Board meeting, without advising Plaintiff the basis for the Unlawful Actions, without making any findings of fact upon which the Unlawful Actions were based, without allowing Plaintiff to rebut any such assertions or findings of fact and in fact without any hearing at all.

75. Moreover, any of the Select Board's consideration of evidence, deliberations, and the Revocation decision itself, were apparently made in secret outside of and prior to the public meeting.

76. The Unlawful Actions, and each of them, caused, and continue to cause, damage to Plaintiff and Plaintiff's business, including without limitation lost revenue, lost earnings, lost economic advantage, reduced property value, loss of share value, loss of share sales, and damaged business reputation, and accordingly deprive Plaintiff of life, liberty, and/or property.

77. These actions of the Town and its Select Board, and each of these actions, were taken under color of state law and violate the United States Constitution and the Plaintiff's right to procedural due process under the Fourteenth and Fifth Amendments to the United States Constitution.

78. At all times relevant, the Town and its Select Board knew or should have known that they were violating the Plaintiff's clearly established Constitutional rights, namely they knew or should have known that they cannot simply take away Plaintiff's rights without so much as a hearing. In fact, the Town knew exactly of the procedure to provide Plaintiff its due process, as it publicly had indicated that it was considering filing a Petition for License Revocation with the NHLC.

79. The actions of the Town and its officials, as described herein, to interfere with, substantially restrict, and/or eliminate the Plaintiff's business, were knowing, malicious, abusive, arbitrary, fundamentally unfair, and completely devoid of any legitimate basis. Instead, they were acts of retribution aimed at Plaintiff for its payment of parking tickets, 91-A Complaint, and other perceived slights detailed herein.

80. If the Town is allowed to continue with its Unlawful Actions, the Plaintiff will suffer additional damages.

81. The Plaintiff is entitled to an award of their damages against the Town, plus punitive damages, attorneys' fees, and costs, and injunctive relief to prevent further deprivation, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and any other available law.

**Count II: 42 U.S.C. § 1983: the Town's Violation of the Fourteenth and Fifth Amendments to United States Constitution (Substantive Due Process Rights and Takings)**

82. Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

83. The Plaintiff has invested, and continues to invest, substantial sums of money in the operation of the Ski Area in reliance upon, in part, the long history of liquor licenses for the Ski Area, the long history of Town approval for liquor licenses for the Ski Area, and the Town's Approval of Plaintiff's liquor license.

84. The Plaintiff's investment was reasonable.

85. The Unlawful Actions of the Town and its officials, as described herein, substantially and adversely interfere with the Plaintiff's reasonable investment-backed expectations.

86. The actions of the Town and its officials, as described herein, to interfere with, substantially restrict, and/or eliminate the Plaintiff's business, were knowing, malicious, abusive, arbitrary, fundamentally unfair, and completely devoid of any legitimate basis.

87. The Unlawful Actions of the Town and its officials were undertaken under the color of law, including state law, and violate the substantive due process clauses of the Fifth and/or Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, and deprive the Plaintiff of its substantive due process rights under such laws.

88. Moreover, and additionally, the Unlawful Actions of the Town and its officials constituted and constitute an unlawful taking of the Plaintiff's property rights without just compensation, in violation of the takings clause of the Fifth Amendment of the United States Constitution and 42 U.S.C. § 1983, and the Plaintiff's rights under such law.

89. By the Unlawful Acts, and the other acts herein, in clear violation of such laws and the Plaintiff's civil rights, the Town has directly and proximately caused the deprivation of the Plaintiff's civil rights and damages to the Plaintiff, including without limitation lost revenue, lost earnings, lost economic advantage, reduced property value, and damaged business reputation.

90. If the Town is allowed to continue with its Unlawful Actions, the Plaintiff will suffer additional damages.

91. The Plaintiff is entitled to an award of their damages against the Town, plus punitive damages, attorneys' fees, and costs, and injunctive relief to prevent further deprivation, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and any other available law.

## Count III: 42 U.S.C. § 1983, Selective Enforcement and the Town's Violation of Equal Protection Clause of the United States Constitution

92. Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

93. Upon information and belief, the Town has not revoked permission for a liquor license or to engage in the sale of alcoholic beverages as to any permittee other than Plaintiff.

94. The Town has not revoked permission for Black Mountain ski area's liquor license or the sale of alcoholic beverages under any ownership other than Black Mountain Community Corporation.

95. The Town's Unlawful Actions taken under Black Mountain Community Corporation's ownership of Plaintiff were knowing, malicious, arbitrary, lacked any rational or legitimate

basis, and were purposefully discriminatory against Black Mountain Community Corporation's ownership.

96. The Town's Unlawful Actions taken against the Plaintiff as outlined herein were taken under color of state law and are impermissible selective enforcement and impermissible discrimination, and accordingly violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Plaintiff's Constitutional and civil rights under the same, and 42 U.S.C. § 1983.

97. By its Unlawful Actions, in clear violation of such laws and the Plaintiff's civil rights, the Town has directly and proximately caused the deprivation of the Plaintiff's civil rights and damages to the Plaintiff, including without limitation lost revenue, lost earnings, lost economic advantage, reduced property value, and damaged business reputation.

98. If the Town is allowed to continue with its Unlawful Actions, the Plaintiff will suffer additional damages.

99. The Plaintiff is entitled to an award of its damages against the Town, plus punitive damages, attorneys' fees, and costs, and injunctive relief to prevent further deprivation, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and any other available law.


**Count IV: 42 U.S.C. § 1983: the Town's *Ultra Vires* Actions are Violations of the Fourteenth Amendment to United States Constitution (Substantive Due Process Rights)**

100.    Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

101.    Additionally and alternatively to the other Counts of this Complaint, as described herein, officials of the Town have taken various actions under the banner and color of their

authority as Town officials, but which were unlawful and *ultra vires*, and well beyond the actual scope of their authority, including purporting to immediately disallow the Plaintiff from serving alcohol at the Alpine Cabin, for which they have a valid license.

102.     The unlawful and *ultra vires* actions of the Town and its officials, as described herein, were knowing, malicious, abusive, arbitrary, fundamentally unfair, and completely devoid of any legitimate basis.

103.     Such actions of the Town and its officials were undertaken under the color of state law, and violate the equal protection clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, and deprive the Plaintiff of its civil and Constitutional rights under such law.

104.     By the *ultra vires* actions as described herein, taken in clear violation of such laws and the Plaintiff' civil rights, the Town has directly and proximately caused the deprivation of the Plaintiff's civil rights and damages to the Plaintiff, including without limitation lost revenue, lost earnings, lost economic advantage, reduced property value, and damaged business reputation.

105.     If the Town is allowed to continue with its Unlawful Actions, the Plaintiff will suffer additional damages.

106.     The Plaintiff are entitled to an award of their damages against the Town, plus punitive damages, attorneys' fees, and costs, and injunctive relief to prevent further deprivation, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and any other available law.

### Count V: Tortious Interference with Contractual Relations and Prospective

### Advantageous Business Relations

107.     Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

108.     As noted herein, an important and substantial portion of the Plaintiff's business includes serving alcohol at the Alpine Cabin.

109.     The Town and its officials knew of this business.

110.     The Town and its officials intentionally and improperly interfered with the Plaintiff's contractual relationships and prospective contractual and economic relationships with its customers, by the various actions as described herein, including the Unlawful Actions.

111.     Each of these actions of the Town and its officials directly and proximately caused, and continues to cause, substantial harm and damages to the Plaintiff, including the loss of advantageous contractual, business, and economic relationships.

112.     Each of these actions and the damages caused thereby arose out of the ownership, occupation, and operation of property and premises.

113.     The Town is liable for the actions of its officials as outlined herein, which were each taken asserting the authority of the Town.

114.     The Plaintiff is entitled to an award of its damages as against the Town for the actions as described herein which interfered with their contractual, business, and economic relationships, and prospective contractual, business, and economic relationships.

### Count VI: Mandamus

115.     Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

116.     Additionally and alternatively to the other Counts of this Complaint, because of the Town's Unlawful Actions taken in direct contravention to law, outside of its authority, and in violation of the Plaintiff's Constitutional rights, the Plaintiff is entitled to a writ of mandamus ordering the Town to withdraw its mandate not to serve alcohol at the Alpine Cabin.

117.     Count Six is brought pursuant to New Hampshire common law, which allows courts to issue writs of mandamus to public officials where other remedies are not available or adequate.

118.     As outlined above, the Town has no authority or jurisdiction over the licensure for service of alcoholic beverages or the sale thereof.

119.     By the Unlawful Actions, and by seeking to prohibit the service of alcohol at the Alpine Cabin, in clear violation of law and the Plaintiff's rights, the Town has directly and proximately caused damages, including lost revenue, lost economic advantage, reduced property value, and damaged business reputation.

120.     If the Town is allowed to continue with its enforcement actions, the Plaintiff will suffer additional damages, including lost revenue, lost economic advantage, reduced property value, and damaged business reputation.

121.     The Plaintiff is entitled to writ of mandamus directed toward the Town, ordering the Town to refrain from action against the Plaintiff relative to its liquor license or ability to sell alcoholic beverages. No remedy short of a writ of mandamus directed toward the

Town will be adequate, because otherwise, the Town will be free to again attempt to interfere with the Plaintiff's exercise of its rights under its liquor license.

122.    To the extent that the Town's enforcement efforts against the Plaintiff are discretionary, a writ of mandamus is still appropriate, because its enforcement efforts have been arbitrary and/or in bad faith. See *Guarracino v. Beaudry*, 118 N.H. 435, 437 (1978).

### Count VII: RSA 91-A

123.    Plaintiff incorporates and re-alleges each and every preceding allegation of this Complaint as if fully set forth herein.

124.    Pursuant to RSA 91-A:2, II, "all meetings, whether held in person, by means of telephone or electronic communication, or in any other manner, shall be open to the public" and "a notice of the time and place of each such meeting, including a nonpublic session, shall be posted in 2 appropriate places."

125.    Pursuant to RSA 91-A:2, I, "'meeting' means the convening of a quorum of the membership of a public body . . . or the majority of the members of such public body if the rules of that body define 'quorum' as more than a majority of its members."

126.    RSA 91-A:3, I(a) provides that "[p]ublic bodies shall not meet in nonpublic session, except for one of the purposes set out in [RSA 91-A:3] paragraph II."

127.    Neither deliberating nor deciding on a Revocation of permission for a liquor license or the sale of alcoholic beverages are purposes for which a nonpublic session may be conducted under RSA 91-A:3, II.

128.    The Select Board violated RSA 91-A by holding this meeting where the deliberation and decision on the Revocation occurred, in secret.

129.     The Select Board knew, or should have known, that its actions were in violation of RSA 91-A; and this lawsuit was necessary to enforce compliance with the terms of RSA 91-A.

130.     Pursuant to RSA 91-A, the decisions made in non-public, including the Revocation, should be voided.

131.     Pursuant to RSA 91-A, the Plaintiff is entitled to its damages resultant from the violation, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     An entry of judgment declaring that the Town's Unlawful Acts are void and/or inapplicable to the Plaintiff, and that enforcement against the Plaintiff is unlawful and unconstitutional;

B.     A preliminary injunction prohibiting the Town from enforcing its Unlawful Actions against the Plaintiff, including without limitation its directive not to serve alcohol, and from taking any other action to interfere with Plaintiff's liquor license or ability to engage in the sale of alcoholic beverages;

D.     An award of Plaintiff's damages, including without limitation for the violations of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983, RSA 91-A, and common law, including compensatory damages and punitive damages, and for state law common law claims, including without limitation tortious interference with contractual relationships;

E.     An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988, RSA 91-A, and other applicable law;

F.     An order reversing and vacating the Town's Unlawful Actions;

G.      A writ of mandamus, enjoining the Town from taking any other action to interfere with Plaintiff's liquor license or ability to engage in the sale of alcoholic beverages; and

H.      All further legal and equitable relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted,

PLAINTIFF,
**ALPINE RESOURCES CORPORATION**,
By its attorneys,

Date: _____    /s/ Christopher T. Meier

10/10/2025

_____
Christopher T. Meier (NH Bar # 17135)
COOPER CARGILL CHANT, P.A.
2935 White Mountain Highway
North Conway, NH 03860
Telephone: 603-356-5439
Email: cmeier@ccclaw.com